UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL GERARD HOUSTON,

               Plaintiff,                        Civil Action No. 10-cv-14831

      v.                              District Judge John Corbett O'Meara
                                      Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 16]**

Plaintiff Michael Houston brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for child's disability insurance benefits under the Social Security Act. Both parties filed summary judgment motions (Dkts. 14, 16), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkts. 4, 15).

## I. RECOMMENDATION

For the reasons set forth below, this Court finds that the ALJ failed to comply with S.S.R. 83-20 in determining whether Plaintiff's mental impairments rendered Plaintiff disabled prior to age 22. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II.  REPORT

### A.  Procedural History

On March 22, 2007, Plaintiff filed applications for both child's insurance benefits based on disability and supplemental security income.  (Tr. 12.)  On both applications Plaintiff alleged a disability onset date of June 10, 1976 (when he was 12 years old).  (Tr. 12, 77.)  On August 17, 2007, the Commissioner denied both applications.  (Tr. 12.)

Plaintiff then filed a request for a hearing, and, on September 8, 2009, he appeared with counsel before Administrative Law Judge ("ALJ") Anthony B. Roshak, who considered the applications *de novo*.  (Tr. 12-17.)  In an October 2, 2009 decision, the ALJ addressed both applications.  (Tr. 12-17.)  Regarding the application for supplemental security income, the ALJ found that Plaintiff was disabled as of March 22, 2007.  (Tr. 17.)  Regarding Plaintiff's child's insurance benefits application, however, the ALJ found that the record contained insufficient medical evidence to establish a physical or mental impairment prior to age 22.  (Tr. 15-16.)  The ALJ's decision became the final decision of the Commissioner on October 8, 2010 when the Appeals Council denied Plaintiff's request for review.  (Tr. 1A.)

Plaintiff filed this suit on December 6, 2010 challenging the Commissioner's child's insurance benefits determination and asserting that his "mental-emotional condition dates from not later than early childhood."  (*See* Pl.'s Mot. Summ. J. at ECF 1; Dkt. 1, Compl. at ECF 1; Tr. 836-38 (request for review by Appeals Council of only the child's benefits decision).)

### B.  Background

Plaintiff, 46 years old at the time of the ALJ's decision, asserts that he has had mental and emotional problems since childhood.  (Pl.'s Mot. Summ. J. at ECF 1.)  Plaintiff has worked at a

2

number of short-term, part-time jobs, including bagging at a grocery store, food prep at a fast food restaurant, and lawn care. (Tr. 95.) It appears, however, that Plaintiff has never held a full-time job or engaged in any substantial gainful employment; his highest yearly earnings were $2,396. (Tr. 2, 89, 95, 856.) He has an eighth grade education which includes time in special education. (*See, e.g.*, Tr. 593, 682, 714.) Plaintiff was incarcerated for six years beginning in 2000. Prior to his incarceration, Plaintiff received social security benefits, but the record is unclear whether physical or mental impairments (or both) were the basis for this prior award. (Tr. 530 (Plaintiff reported receiving SSI for "emotional problems"), Tr. 831 (cognitive evaluator noting Plaintiff had received benefits prior to incarceration but that "it is unclear exactly what he was rated for").)

### 1. The Hearing Before the ALJ

Plaintiff provided limited testimony regarding the nature of his impairments. (Tr. 841-55.) He stated that he has problems reading (Tr. 843), understanding detailed instructions, and maintaining concentration (Tr. 847). Regarding his past work experience, Plaintiff explained that he "couldn't get along with people" and that an "emotional problem" prevented him from working. (Tr. 849, 851.) When the ALJ sought further explanation, Plaintiff stated that when something goes wrong at work, he handles the situation by arguing with co-workers or supervisors and "walk[ing] off and leav[ing]." (Tr. 853.) Plaintiff also explained that he has had hallucinations since childhood, specifically, "Sometimes [dead people] just talk. Sometimes it be my family coming back and talking to me." (Tr. 852.)

A vocational expert ("VE") also testified at the hearing. (Tr. 855-59.) The VE testified that if Plaintiff's testimony was credited, Plaintiff could not perform any work. (Tr. 857.) The VE explained,

3

> [T]he claimant has eluded to the difficulties here and the record is rather replete with psychiatric, psychological or emotional difficulties that have been described and to some extent . . . in the record. But certainly there were numerous comments in the record and also [the claimant's] testimony here today that he's had multiple jobs in the past but has not been able to sustain employment because of his difficulties getting along with people. . . . [C]learly walking away from a job would not be tolerated on a frequent basis. So that would lead to termination. And obviously the volatility . . . the person would be at risk to self and to other employers would not be willing [t]o put themselves at risk if someone should display that behavior in the work place. So that would lead to terminations.

(Tr. 858.)

### 2.  Lay Witness Evidence

#### (a)  Plaintiff's Mother

Plaintiff's mother, Shellie Houston, completed a Function Report for Plaintiff's disability application. She stated that on a typical day Plaintiff watches "a lot" of TV, visits friends and his six year-old daughter, drives a disabled cousin to a clinic, does chores, and "sometimes" shops. (Tr. 102.) The Report also states that Plaintiff plays chess daily, and that he is "very good at chess." (Tr. 106.) Plaintiff's mother described Plaintiff as lacking "logic" and thinking "like a elementary school kid – not like an adult." (Tr. 109.)

Ms. Houston also provided a Statement of Claimant or Other Person in connection with Plaintiff's application for benefits. (Tr. 154-167.) She explained that, growing up, Plaintiff "was a slow learner: he really wasn't into studying, and he was always into trouble, so we eventually got him into special ed[ucation] – he was an excellent chess player; in fact, he won the championship over at [an elementary school]." (Tr. 154-55.) Ms. Houston also explained that Plaintiff "was bipolar. We went to psychiatrists when he was young. . . . [But Michael] wouldn't talk. So, just never got anywhere doing that." (Tr. 155.) Ms. Houston could not remember the names of these

4

psychiatrists, however. (*See* Tr. 156.) Plaintiff's mother also mentioned that as a child, medication was prescribed to calm Plaintiff down. (Tr. 159.)

### (b) Plaintiff's Father

Plaintiff's father, Adolphus Houston, also provided a Statement of Claimant or Other Person. (Tr. 127-142.) He explained that Plaintiff had a cleft palate and a speech impediment as a child. (Tr. 128.) Mr. Houston also stated that Plaintiff has always had a "very short attention span." (Tr. 135.) Regarding work, he asserted that Plaintiff "would not be able to function in [an] environment in which he would have a choice, as opposed to being controlled." (Tr. 140-41.) Mr. Houston also indicated that once Plaintiff gets a paycheck, holding the job becomes less of a priority. (Tr. 141.)

### (c) Plaintiff's Brother

Plaintiff's brother, Myron Houston, also provided a Statement of Claimant or Other Person. (Tr. 143-53.) To emphasize that Plaintiff lacked the capacity to be "a successful criminal because he is dysfunctional," Myron Houston explained that Plaintiff was arrested in 1991 after he "waved the police down" with a bag of "dope." (Tr. 144.) Plaintiff's brother stated that he did not attribute Plaintiff's "mental condition" to using narcotics; rather, "[h]e's been like this ever since we were little kids. Five years old, coming up, he always was off. That's why he got kicked out of school. Every time, he always did something to provoke somebody. That's all he did his whole life." (Tr. 150.) Similarly, Myron Houston explained, "Mentally, he has been disabled since he was a child." (Tr. 152.)

### (d) Plaintiff's Fourth-Grade Teacher

Plaintiff's fourth-grade and chess teacher, Charles Moody, completed a Teacher

Questionnaire in connection with Plaintiff's disability application. (Tr. 735-42.)[1] In the functional area of acquiring and using information, he opined that Plaintiff had "serious" and "very serious" problems in a number of subcategories. (Tr. 736.) He also indicated "very serious" problems in the area of attending and completing tasks (including taking turns and carrying out multi-step instructions) and in the area of self-care (including handling frustration appropriately). (Tr. 740.)

*(e) Plaintiff's Teachers From the Bailey Program*

Between 1976 and 1978, Plaintiff attended the Bailey Program for Emotionally Impaired students for seventh and eighth grades. (Tr. 592.) According to one of the Program's teachers, the Program admitted students who were "(1) eligible for special education services as Emotionally Impaired, and (2) behaviorally disruptive to the degree that they were not able to be educated in traditional school settings." (Tr. 592.) The administrative record contains reports from three Bailey Program teachers: Kathy Bergman, Roger Martin, and Thomas Stapleton.

Kathy Bergman was one of Plaintiff's teachers at Bailey who observed Plaintiff during lunch and in "mini courses." (Tr. 706, 713.) Bergman indicated on a Teacher Questionnaire that Plaintiff had "obvious" problems in every subcategory related to acquiring and using information, "serious" problems in attending-and-completing-tasks (including a "very serious" problem in working without distracting self or others), and "very serious" problems in both the interacting and relating to others and self-care domains. (Tr. 707-11.)

---

[1]A Teacher Questionnaire asks a teacher to rate a claimant in a number of aspects, or subcategories, of five functional domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, and (5) self-care. (*E.g.* Tr. 707-10.) The questionnaire also asks the teacher to answer questions regarding a sixth domain: health and well-being. (*E.g.* Tr. 711.) The questionnaire's scale escalates as follows: "no problem," " a slight problem," "an obvious problem," "a serious problem," and "a very serious problem." (*E.g.*, Tr. 707.)

6

Roger Martin was another teacher in the Bailey Program who regularly observed Plaintiff. (Tr. 143-53.) In his Statement of Claimant or Other Person, Martin noted that Plaintiff scored in the bottom percentiles (e.g., the first percentile in reading) on a November 11, 1971 Metropolitan Achievement Test (when Plaintiff was eight years old). (Tr. 595.) He described Plaintiff as one who appeared to take "great pleasure" in provoking other students, enjoyed attention, and manipulated school rules (e.g., to circumvent a no-spitting rule, Plaintiff instead "flicked" spit with his fingers). (Tr. 593.) Martin stated that Plaintiff "had the interest and the capacity to develop interpersonal relationships . . . but his provocative and inappropriate behaviors" hampered such relationships. (Tr. 593.) Martin could not recall whether Plaintiff's behavior had improved by the time he left the Bailey Program in 1978. (Tr. 594.)

Martin also completed a Teacher Questionnaire. (Tr. 715-22.) There, he indicated that Plaintiff had "serious" or "very serious" problems in every subcategory of the following domains: acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 716-18.) He remarked that Plaintiff "displayed chronic emotional difficulties – he was a *very* disruptive student." (Tr. 720.)

Thomas Stapleton also taught in the Bailey Program; he was involved with recreation and bused Plaintiff to gyms. (Tr. 723.) He too completed a Teacher Questionnaire. (Tr. 723-30.) Similar to Bergman and Martin, Stapleton indicated that Plaintiff had "serious" or "very serious" problems in various aspects of attending and completing tasks, interacting and relating with others, and self care. (Tr. 723-28.)

### 2. *Medical Evidence*

There are almost no medical or diagnostic records from Plaintiff's childhood. In fact,

7

Plaintiff explains,

> Dr. William Grayson is 78 [years old] and has no recollection or
> memory [of] referring me . . . to Dr. William Donnelly. . . . Dr.
> Donnelly died in 1998; my long-inactive record was not retained. . . .
> Oakland County's Child and Adolescent Services Division records
> are gone . . . [and] [t]he successor community mental health agency
> says they store records for no more than seven years.

(Pl.'s Mot. Summ. J. at ECF 4.)

The lone, relevant record from Plaintiff's youth is a "master file card" which references an

intelligence test administered in February 1978 (when Plaintiff was 14 years old).  (Tr. 684.)  The

test revealed a performance-scale IQ of 89 and a full-scale IQ of 85.  (Tr. 684.)

There are, however, substantial medical records when Plaintiff is older that often reference

his condition as a youth.

### (a) Medical Records Prior to 2000

Plaintiff went to the hospital three times between 1993 and 1994 for depression.  In July

1993, when Plaintiff was 30 years old, Plaintiff was hospitalized for three days for a suicide attempt.

(Tr. 627.)  The listed stressors were the loss of a job and a girlfriend.  (Tr. 627.)  Dr. A. Pasternak

diagnosed Plaintiff with atypical depression, mild mental retardation, and antisocial personality upon

discharge.  (Tr. 627.)  In September 1993, Plaintiff went to the emergency room for depression.

(Tr. 628.)  In 1994, Plaintiff was hospitalized due to "depressed mood and suicidal ideation[]."

(Tr. 570.)

*(b) Medical Records from the Michigan Department of Corrections*[2]

On May 11, 2000, Robert Berry, M.S., M.A., in MDOC's Reception and Guidance Center noted,

> [t]here is no evidence the prisoner has really had any kind of serious psychiatric history. Yet, there has been . . . substance abuse problems, as well as learning problems, and he certainly seems to have a number of issues in his personal background that are a bit unresolved. His tendencies seem to be related more to underachievement and social failure rather than to a particular antisocial orientation to experience, *per se*.

(Tr. 232.) Berry also remarked that while Plaintiff's concentration suffered from "impulsivity and impatience," there was "no evidence of pathological distractibility." (Tr. 232.) Berry noted some "organicity impairments" were suggested, and that "further assessment of his general psychological function would probably prove helpful," but "[t]here certainly seems no evidence of a meaningful psychosocial adjustment" and that there were "no signs of gross psychopathology, and no evidence of acute psychological difficulties." (Tr. 233.) Berry's diagnostic impression was impulse-control disorder, not otherwise specified ("NOS"), substance abuse, and personality disorder, NOS. (Tr. 233.)

On August 17, 2000, Plaintiff completed a form indicating that since his previous incarceration, he had experienced no mental or physical problems. (Tr. 208.)

---

[2]Apparently, Plaintiff was arrested in 1991 for waving a bag of cocaine in front of police officers. (Tr. 747.) Then in 1997 he had an encounter with a 15 year old girl who apparently lied about her age. (Tr. 747.) In 1999, Plaintiff reportedly received a post card asking him to claim a color TV at the Silver Dome; Plaintiff traded cocaine with the other winners for their televisions and was arrested. (Tr. 747.)

Plaintiff was incarcerated in the MDOC from mid-2000 to mid-2006. Plaintiff's MDOC health records span hundreds of pages. Only a limited number of records are relevant to Plaintiff's mental impairments, however. The remaining records are primarily regarding ear infections and related issues, Plaintiff's diabetic condition and corresponding diet, and gastrointestinal issues.

A November 7, 2002 MDOC Mental Health Progress Note suggests that Plaintiff's parole board had inquired into why Plaintiff had not seen a psychologist. (Tr. 260.) The nurse completing the Note stated that Plaintiff was "oriented in all psychological spheres with no evidence of gross psychopathology being noted." (Tr. 260.)

On May 15, 2003, Plaintiff apparently saw an MDOC psychologist because of a referral from a corrections officer. (Tr. 371.) Although the copy of the referral in the record is obscured, it was premised in part on Plaintiff's "deep anger." (Tr. 371.) The evaluating psychologist found "no signs or symptoms of mental illness. Inmate denies problems [and] declines treatment." (Tr. 371.)

On May 17, 2006, Mark Skinner, M.S., completed a Psychological Report for Plaintiff's parole board evaluation. (Tr. 530-32.) Regarding Plaintiff's clinical history, Skinner noted that Plaintiff "appears to have some intellectual limitations and was removed from high school for behavior problems." (Tr. 530.) However, Plaintiff denied "any history of mental illness or psychiatric interventions. He states he has never had mental health problems other than being 'slow.'" (Tr. 530.) Skinner continued,

> [Houston] has been seen on a few occasions by institutional psychologist[s] . . . for minor problems. No referrals were made for further mental health intervention. Mr. Houston does not appear to have any form of formal mood or thought disturbance requiring treatment presently.

(Tr. 530.) Skinner diagnosed Plaintiff with personality disorder, NOS and borderline intellectual functioning. (Tr. 532.)

*(c) Medical Records Post-2006*

On October 14, 2006, Wladimir Zarski, M.D. performed a psychiatric evaluation on behalf of the State Disability Determination Services ("DDS"). Regarding Plaintiff's personal and medical history, Plaintiff reported being depressed since childhood but the he became more depressed after he was released from prison. (Tr. 570.) Plaintiff also told Dr. Zarski that "he has visual hallucinations. 'I have seen dead people all my life.'" (Tr. 570.) Dr. Zarski noted that Plaintiff's "early developmental milestones were unremarkable" but also that Plaintiff attended special education and dropped out of school due to behavior problems. (Tr. 570.) Dr. Zarski diagnosed Plaintiff with adjustment disorder with depressed mood, psychotic disorder, NOS. (Tr. 572.)

On January 27, 2007, Barry Dauphin, Ph.D., a licensed psychologist, interviewed Plaintiff to document "his current mental status and to [provide] an independent opinion about what type[s] of assessment procedure[s] would be necessary" to determine whether Plaintiff was disabled. (Tr. 577-81.) Dr. Dauphin noted, "Mr. Houston was diagnosed with schizophrenia (most likely, Schizophrenia, Paranoid Type) over 20 years ago, although it is unclear when this diagnosis was first documented. He has received this diagnosis through various mental health professionals during the years." (Tr. 577.) Dr. Dauphin continued, "[b]y oral history it is clear that Mr. Houston was classified for special education services, most likely in association with some level of mental retardation." (Tr. 578.) Dr. Dauphin remarked that Plaintiff's act of leaving during a criminal sentencing hearing (which led to an additional charge of escape) was "consistent with a longstanding history of impulsive actions that have self-destructive consequences." (Tr. 578.) During the 50-minute evaluation with Dr. Dauphin, Plaintiff became less responsive: "[h]e was either hearing voices or he experienced dissociative episodes during the interview. . . . He stared out into

11

space . . . .  These episodes lasted anywhere from a minute to a few minutes." (Tr. 579.)  Dr. Dauphin recommended a number of diagnostic tests which would better assess Plaintiff's mental impairments.  He diagnosed Plaintiff with schizophrenia, chronic paranoid type (by history).  (Tr. 580.)  He further indicated that major depressive disorder with psychotic features, cognitive disorder, dissociative disorder, and dependent personality disorder were not, but should be, ruled out.  (Tr. 580.)

Beginning in May 2007 Plaintiff sought mental health treatment from Easter Seals – Michigan, Inc.  (Tr. 698-704.)  On May 3, 2007, social worker Christy LaDronka  diagnosed Plaintiff with psychotic disorder, NOS, and schizophrenia, paranoid type.  (Tr. 700.)  A June 6, 2007 psychiatric assessment from Easter Seals provides that Plaintiff reported hallucinations.  (Tr. 703.)  The assessor, Malathy Nair, M.D., noted that Plaintiff functioned in the "low average range of intelligence" and that Plaintiff's attention span and concentration appeared "somewhat impaired."  (Tr. 703.)  Dr. Nair diagnosed Plaintiff with schizophrenia, paranoid type, and noted to rule out schizoaffective disorder.  (Tr. 703.)  In December 2007 Plaintiff was discharged from Easter Seals' outpatient care because he had refused to participate in his treatment.  (Tr. 699.)

On July 26, 2007, Firoza Van Horn, Psy.D., a licensed psychologist, evaluated Plaintiff.  (Tr. 639-49.)  Dr. Van Horn reviewed and discussed, among other evidence in the record, Dr. Zarski's October 2006 psychiatric evaluation, Dr. Dauphin's January 2007 report, and Martin's Statement of Claimant or Other Person (all discussed above).  (Tr. 639.)  Regarding diagnostic testing, Dr. Van Horn commented that "Mr. Houston was not motivated.  He would say 'I don't know' to even basic questions.  Although the tests are scored, the results may not be reliable."  (Tr. 645.)  On the Wechsler Adult Intelligence Scale-III ("WAIS-III") Plaintiff scored 59, 57, and

54 on his verbal, performance, and full-scale IQ, respectively.  (Tr. 646.)  This placed Plaintiff in

the Mild Mental Retardation range.  (Tr. 646.)  Dr. Van Horn opined, however, that Plaintiff's scores

"should be higher and at least in the Borderline range."  (Tr. 646.)  Although Dr. Van Horn believed

that Plaintiff's Minnesota Multiphasic Personality Inventory 2 test scores were reflective of either

exaggeration or a "cry for help," they revealed that Plaintiff was "impulsive and unable to delay

gratification" and that he has "little respect for social standards and often find[s] himself in direct

conflict with societal values."  (Tr. 647.)  Dr. Van Horn concluded that Plaintiff had a history of

severe emotional behavioral problems "that border[] on a sociopathic personality disorder."

(Tr. 647.)  However, based on her review of the records and her examination of Plaintiff, Dr. Van

Horn believed that Plaintiff did not suffer from any mental illness such as schizophrenia.  (Tr. 647.)

She diagnosed Plaintiff with adjustment disorder with depressed mood, polysubstance abuse, in

partial remission, borderline intellectual functioning, and adult antisocial behavior.  (Tr. 648.)

On August 13, 2007, Leonard Baluna, Ph.D., a psychologist, completed a Mental Residual

Functional Capacity Assessment on behalf of the State DDS.  (Tr. 650-52.)  He found that Plaintiff

was not markedly limited in any category but had moderate limitations in the ability to understand

and remember detailed instructions, carry out detailed instructions, maintain concentration for

extended periods, and interact appropriately with the public.  (Tr. 650-51.)  He concluded that

Plaintiff could perform unskilled work involving 1, 2, or 3 step instructions with limited need for

sustained concentration and minimal contact with the general public.  (Tr. 652.)

Dr. Baluna also completed two Psychiatric Review Technique forms ("PRTFs"): one for the

period beginning March 22, 2007 (apparently for Plaintiff's SSI application); the second for the

period June 30, 1981 to July 23, 1985 (apparently for Plaintiff's child's disability application).  For

13

the PRTF covering 1981 to 1985, Dr. Baluna concluded that there was insufficient medical evidence to make a disability determination.  (Tr. 668.)

On September 2, 2008, Plaintiff began outpatient treatment at the University Psychiatric Center – Jefferson ("UPC").  (Tr. 733-34, 762-92.)  Tahira Masood, M.D. completed the intake assessment.  (Tr. 733-34, 788-91.)  She noted, "[p]atient came with his friend [Stewart Filler], with disability papers in his hand. . . . [Mr. Houston] [s]tated that his friend brought him here and . . . he knew nothing about it."  (Tr. 733.)  Plaintiff reported to Dr. Masood that he had been having mental and "hyper" problems since the sixth grade, but had not been on any medications since the age of 10, and had not received outpatient mental-health care.  (Tr. 733, 788.)  Filler, when called into the exam room, "kept on rambling around that he knew the patient since he was 10 and that he had emotional and physical problems."  (Tr. 790.)  Dr. Massod declined to comment on Plaintiff's functional ability because "he is a new patient for me" but diagnosed Plaintiff with psychosis, NOS, and indicated that malingering[3] and Munchausen Syndrome by proxy[4] should be ruled out.  (Tr. 733.)  Dr. Masood prescribed Ambien for Plaintiff's sleep problems and Risperidone for Plaintiff's psychosis.[5]  (Tr. 791.)

---

[3]"The essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision* 739 (4th ed. 2000).

[4]"This syndrome almost always involves a mother abusing her child by seeking unneeded medical attention for the child.  It is rare and poorly understood.  The cause is unknown."  A.D.A.M. Medical Encyclopedia, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002522/ (last checked Sept. 20, 2011).

[5]"Risperidone (Risperdal) is an antipsychotic medication used to treat mental illnesses including schizophrenia, bipolar disorder, and irritability associated with autistic disorder."  AHFS Consumer Medication Information, PubMed Health, http://www.ncbi.nlm.nih.gov/

On September 25, 2008, Dr. Van Horn conducted another psychological evaluation of Plaintiff.  (Tr. 743-51.)  Among the documents she reviewed were her 2007 evaluation, the records from the Easter Seals, and a statement from Bergman (one of the Bailey Program teachers).  (Tr. 743.)  During the exam, Plaintiff "did not display behaviors consistent with someone who is Schizophrenic or psychotic."  However, Dr. Van Horn concluded that Plaintiff was

> undersocialized and has no capacity to maintain a healthy relationship with anyone.  For this reason, it would be difficult for him to maintain a job.  He will likely walk out when faced with pressure.  Although he claims he hears voices, he does not offer enough symptoms that are consistent with someone with a mental illness. . . .  Mr. Houston's problem is consistent with someone with a personality disorder such as antisocial personality disorder as opposed to a mental illness.

(Tr. 750.)  Dr. Van Horn diagnosed Plaintiff with alcohol abuse and antisocial personality disorder.  (Tr. 750.)

Plaintiff returned to Dr. Masood for medication reviews on a regular basis in the fall of 2008 and into the winter and spring of 2009.  (Tr. 772-74, 777-79, 783-85.)  Dr. Masood noted that Plaintiff "is able to verbalize his problems but appears immature from his responses; his way of communicating and conducting himself give the impression of somewhat cognitive impairment – could be mild to borderline."  (Tr. 778.)  At one point, Dr. Masood asked Plaintiff the number of siblings he had, and Plaintiff began counting them on his fingers.  (Tr. 773.)  Dr. Masood's diagnosis was psychotic disorder, NOS, learning disorder, NOS (by history), and to rule out factitious disorder[6] and Munchausen by proxy.  (Tr. 773, 778.)

---

pubmedhealth/PMH0000944/ (last checked Sept. 21, 2011).

[6]"Malingering differs from Factitious Disorder in that the motivation for the symptoms production in Malingering is an external incentive, whereas in Factitious Disorder external

It February 2009, Plaintiff presented at St. John's Health, Eastwood.  (Tr. 759-61.)  The intake assessment provides that Plaintiff reported sadness, poor concentration, confusion, insomnia, and that he is easily provoked.  (Tr. 759.)  The form also provides that Plaintiff "may have some kind of mental retardation."  (Tr. 759.)  Plaintiff was diagnosed with schizophrenia, paranoid type, dependent personality disorder, and antisocial personality disorder.  (Tr. 761.)

It appears that in August 2009 two other doctors at UPC, Richard Balon and Jaya Mergu, took over Plaintiff's treatment from Dr. Masood.  (Tr. 762-65.)  Drs. Balon and Mergu noted that Plaintiff handed them some  papers and stated "my court date is on [September 8, 2009]."  (Tr. 764.)  They noted that Plaintiff had "poverty of speech and poverty of thought content" but that "he did not see[m] to be having frank cognitive deficits."  (Tr. 764.)  Drs. Balon and Mergu maintained Dr. Masood's diagnosis.  (Tr. 764.)  Dr. Mergu also completed a questionnaire indicating that Plaintiff had "marked" limitations in carrying out complex job instructions, remembering such instructions, interacting appropriately with supervisors, maintaining sustained concentration, and responding appropriately to customary work pressures.  (Tr. 795.)

On August 26, 2009, Plaintiff underwent cognitive testing at the University of Michigan's Neuropsychology Section.  (Tr. 831-35.)  Alicia Bord, Ph.D., a licensed psychologist, administered a battery of tests.  (Tr. 832.)  Dr. Bord found that Plaintiff's intellectual ability was "extremely low" – a performance scale IQ of 56.  (Tr. 833.)  She noted, however, that as "observed in previous [performance] testing, the patient resigned very easily on tasks, suggesting that these results are at least a mild underestimate of his abilities."  (Tr. 833.)  Her impression was that Plaintiff's "cognitive

---

incentives are absent.  Evidence of an intrapsychic need to maintain the sick role suggests Factitious Disorder."   American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision* 739 (4th ed. 2000).

functioning is below average" and that his "general intellect is in the borderline impaired range." (Tr. 834.)  Dr. Bord opined that Plaintiff would have "difficulty in adequately managing more complex independent tasks, such as financial management." (Tr. 834.) She concluded "[a]s in many cases of borderline intellectual functioning, the origin of Mr. Houston's cognitive difficulties is unclear" and that it was not expected that Plaintiff's cognitive functioning would improve over time. (Tr. 834.)

### C.  Framework for Adult-Child's Disability Determinations

"To qualify for receipt of child's disability insurance benefits based on the income of a parent wage earner, the claimant must 1) file an application for child's benefits, 2) be unmarried at the time of filing, and 3) be under age eighteen, be eighteen years or older and have a disability that began before age twenty-two years old, or be eighteen years or older and qualify for benefits as a full time student." *Cornn v. Comm'r of Soc. Sec.*, 7 F. App'x 369, 371 (6th Cir. 2001) (citing 20 C.F.R. § 404.350).

An applicant for child's insurance benefits based on a disability before age 22 will be found disabled if the applicant is unable "to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).  The regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

17

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520(a); *Bonham-Conn v. Comm'r of Soc. Sec.*, No. 08-13248, 2009 WL 3211000, at *6 (E.D. Mich. Sept. 29, 2009).

### D.  The Administrative Law Judge's Findings

The ALJ's decision addressed both Plaintiff's application for child's insurance benefits based on disability and his application for supplemental security income.  Regarding the child's benefits determination appealed to this Court, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of June 10, 1976 (when Plaintiff was 12 years old).  (Tr. 14.)  He further found that "there is no evidence of a medically determinable impairment prior to July 22, 1985, the date on which Claimant attained age 22."  (Tr. 14.)  The ALJ explained:

School records and sympathetic advocatorial statements obtained from relatives and from teachers do not constitute evidence of a physical or mental impairment prior to the attainment of age 22.

Under the provisions of 20 C.F.R. 404.1508, a physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings.

In this case, the undersigned is constrained to find that there is no medical evidence of any physical or mental impairment prior to the attainment of age 22.

18

(Tr. 15 (citations to the administrative record omitted).)[7]

### E. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals

---

[7]Since March 22, 2007, however, the ALJ found that Plaintiff suffered from the following severe impairments: "schizophrenia, chronic paranoid type, antisocial personality disorder, borderline intellectual functioning, diabetes mellitus, hypertension, gastritis, and history of polysubstance abuse (drugs and alcohol)." (Tr. 15.) The ALJ further found that Plaintiff was disabled within the meaning of the Act as of March 22, 2007. (Tr. 16.)

Council." *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

### F. Analysis

Plaintiff argues that the ALJ inappropriately discounted his non-medical evidence of a disabling mental or emotional impairment before age 22.  He asserts, "[s]ome childhood conditions are accepted on lay evidence, and the lay evidence for my childhood condition comes from specialists in the field of education; and my handicaps amount to the inability to learn and retain." (Pl.'s Mot. Summ J. at ECF 1-2.)

The Commissioner responds that the "regulations make clear" that the "subjective statements from [Plaintiff's] parents, brother, and former teachers (all gathered 30 years after the fact)" are not medical evidence.  (Def.'s Mot. Summ. J. at 7.)  And, the Commissioner argues, medical evidence is a prerequisite to a finding of disability under the Act.  (Def.'s Mot. Summ. J. at 7  (citing 20 C.F.R. §§ 404.1508, 404.1527; S.S.R. 96-4p).)  Therefore, the Commissioner concludes, the ALJ

did not err in concluding that there was insufficient medical evidence to demonstrate disability prior to age 22.

This Court does not agree with the entirety of the Commissioner's syllogism as the argument overlooks a Social Security Ruling that governs this case.[8]  It is true that "[i]n claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process . . . ."  S.S.R. 96-4p, 1996 WL 374187, at *2; *see also* 20 C.F.R. § 404.1508.  But here, the ALJ – based on the medical evidence of record – found Plaintiff disabled as of March 22, 2007.  (Tr. 15-16.)  And "[i]n cases like this, where a claimant with an alleged disability onset date preceding [his] 22nd birthday files an application for adult child's benefits, and has already been found disabled under another title of the Social Security Act for the period postdating [his] 22nd birthday, SSR 83-20 requires the ALJ to determine the onset date of disability."  *Plumley v. Astrue*, No. 2:09-CV-42, 2010 WL 520271, at *5 (D.Vt. Feb. 9, 2010) (citing S.S.R. 83-20, 1983 WL 31249).

Regarding disabilities of a "nontraumatic origin,"[9] S.S.R. 83-20 provides that the ALJ should consider "the applicant's allegations, work history, if any, and the medical and *other evidence* concerning impairment severity."  1983 WL 31249 at *2 (emphasis added).  And the Ruling further

---

[8]"Social Security Rulings are agency rulings 'published under the authority of the Commissioner of Social Security and are binding on all components of the Administration.'" *Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990) (quoting 20 C.F.R. § 422.408; citing *Heckler v. Edwards*, 465 U.S. 870, 873, n. 3 (1984)).

[9]"For disabilities of traumatic origin, onset is the day of the injury if the individual is thereafter expected to die as a result or is expected to be unable to engage in substantial gainful activity . . . for a continuos period of at least 12 months."  S.S.R. 83-20, 1983 WL 31249, at *2.

discusses the role of non-medical evidence in an onset date determination:

> Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.  In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process. . . .
>
> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available.  When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy.  However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record. . . .
>
> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., [on] the date the claimant stopped working. . . .
>
> If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation.  Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition.

S.S.R. 83-20, 1983 WL 31249 at *2-3.

The Court acknowledges that under the Ruling, "medical evidence serves as the primary element in the onset determination."  S.S.R. 83-20, 1983 WL 31249, at *2.  Yet, consistent with this Court's reading of S.S.R. 83-20, the absence of contemporaneous medical records does not preclude a finding of disability:

> While [S.S.R. 83-20] clearly emphasizes the importance of objective medical evidence, it acknowledges that in some cases, the claimant's impairment may have become disabling prior to the date it was first

> diagnosed. . . . Therefore, although objective medical evidence is necessary to establish the existence of a disabling impairment, *see, e.g.*, 20 C.F.R. § 404.1508; SSR 96-4p, if a claimant has already been found to suffer from a disabling impairment, objective medical evidence, while preferred, is not essential to resolving the onset date of that disability.

*Plumley*, 2010 WL 520271, at \*7 (alteration to citation); *see also Moriarty v. Astrue*, No. 07-cv-342-SM, 2008 WL 4104139, at \*6 (D.N.H. Aug. 28, 2008) ("Nowhere in [SSR 83-20] is there any suggestion that the absence of medical records establishing an onset date is fatal to an individual's disability claim. In fact, the SSR provides just the opposite, specifically noting that in some cases it may be necessary to infer the onset date of a claimant's disability from non-medical evidence.").

In this case, the ALJ did not comply with S.S.R. 83-20. Rather, the ALJ dismissed Plaintiff's lay evidence out-of-hand: "[s]chool records and sympathetic advocatorial statements obtained from relatives and from teachers *do not constitute evidence* of a physical or mental impairment prior to the attainment of age 22." (Tr. 15 (emphasis added).) The ALJ further reasoned that absent "medical evidence of any physical or mental impairment prior to the attainment of age 22" Plaintiff could not be found disabled. (Tr. 15.) Although the ALJ is not required to cite S.S.R. 83-20 by name, which he did not, and minor deviations from the factors provided by the Ruling provides for consideration can be tolerated, the ALJ's singular focus on medical evidence showing disability prior to age 22 does not even comply with the purpose of the Ruling. *See Parmenter v. Astrue*, No. 08-CV-1132, 2010 WL 2884866, at \*4 (N.D.N.Y. Apr. 23, 2010) *report adopted in relevant part by* 2010 WL 2803418 (N.D.N.Y. July 15, 2010) (remanding to ALJ and reasoning, "The ALJ in this case adopted the position that Plaintiff was required to produce documents definitively demonstrating that his mental impairments were disabling during the period between [Plaintiff's

23

alleged onset date] and [the later date the ALJ found Plaintiff disabled].  This position is contrary to SSR 83-20 . . . . [G]iven the lack of precise evidence as to the onset of disability, the ALJ was required to infer the date of disability.").  For this reason this Court also declines to find the ALJ's error harmless.  *See Plumley*, 2010 WL 520271, at *6 ("[C]ourts have held that an ALJ's failure to follow SSR 83-20's requirement to determine an onset date is harmless error, where the ALJ finds that the onset date post-dated the date last insured; substantial evidence supports that finding; *and the decision generally comports with the analysis set forth in SSR 83-20*." (emphasis added)).  Accordingly this Court recommends that this case be remanded so that the ALJ can comply with the onset-date-determination procedure set forth in S.S.R. 83-20.[10]

---

[10]In *Michael v. Astrue*, No. 09-123-GWU, 2010 WL 1994905 (E.D. Ky. May 19, 2010), the Court found that the lay evidence offered by the plaintiff did  not support an earlier onset date under S.S.R. 83-20.  The ALJ had found that the plaintiff "became disabled as of November 11, 2004 as a result of impairments relating to a psychotic disorder, a schizoaffective disorder, and depression." *Id.* at *3.  Relying on S.S.R. 83-20, the plaintiff argued that lay evidence supported an onset date of May 1, 2002.  *Id.* at *4.  The Court rejected this argument relying on the Ruling's language that "'the established onset date must be fixed on the facts and can never be inconsistent with the medical evidence of record'" and that "'the impact of lay evidence on the decision on onset will be limited to the degree it is not contrary to the medical evidence of record.'" *Id.* at *5 (quoting S.S.R. 83-20).  In particular, none of the medical evidence of the plaintiff's mental impairments "related back" to an earlier time; i.e., physicians "did not indicate that her mental problems dated back to May[] 2002." *Id.*  The ALJ also found that the lay evidence was not fully supportive of an earlier disability onset date.

In addition to not being controlling, *Michael* is distinguishable.  As mentioned above, the ALJ here did not consider the lay evidence nor did he analyze whether the substantial medical evidence that was offered shed light on whether Plaintiff could have been disabled as a child.  Moreover, simply because there is no medical opinion relating back a mental impairment to the alleged onset date does not mean that the lay evidence supporting that onset date is "contrary to the medical evidence of record."  Restated, simply because lay evidence is not *supported* by the medical evidence does not mean the lay evidence is "inconsistent" or"contrary" with it.  When medical evidence is silent as to the precise onset date, lay evidence of a particular onset date is not "inconsistent" with this omission.  *Cf. Beasich v. Comm'r of Soc. Sec.*, 66 F. App'x 419, 429 (3d Cir. 2003) (noting, in the context of discussing S.S.R. 83-20, "The ALJ also used the lack of medical treatment for mental impairment during the period between 1984 and 1988 as a reason for not crediting [lay witness] testimony. However, lay evidence does not have to be corroborated by

24

Moreover, the Court notes that upon a review of the evidence of record – which, as summarized at length above, involves multiple opinions and diagnoses from numerous medical sources – it is not obvious that a remand would be a mere formality. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (noting that courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality"). Rather, the record is arguably ambiguous as to when functional limitations attributable to certain of Plaintiff's mental impairments first manifested.

For instance, the Court notes that Plaintiff's intellectual functioning as of March 2007 could have existed prior to age 22. *See Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001) (noting that "absent evidence of sudden trauma that can cause retardation," IQ tests create a rebuttable presumption of a fairly constant IQ throughout a claimant's life); *Rhoads v. Comm'r of Soc. Sec.*, No. 1:09-CV-789, 2010 WL 5855980, at *6 (W.D. Mich. Oct. 5, 2010) (reasoning, in the context of discussing Listing 12.05, which requires evidence of mental retardation before age 22, "that testing administered when Plaintiff was 28 years of age indicated that he possesses . . . a full-scale IQ of 67. The ALJ accorded no weight to this evaluation on the ground that 'these scores were attained subsequent to age 22.' The Court finds this conclusion to be in error."). In particular, two relatively recent intelligence tests rated Plaintiff's IQ in the mild-mental-retardation range. (Tr. 646 (WAIS-III testing by Dr. Van Horn revealed 57 and 54 on performance- and full-scale IQ, respectively); Tr. 833 (testing of Dr. Bord found performance-scale IQ of 56).) Further, throughout the record, various doctors remarked on Plaintiff's sub-average intellectual functioning. (Tr. 530

---

contemporaneous medical evidence to be credible. . . . Lay testimony as to mental functioning cannot be deemed non-credible simply because contemporaneous medical corroboration is lacking.").

(MDOC psychological report inferring that Plaintiff had "some intellectual limitations" and Plaintiff self-reporting that he was "slow"); Tr. 578 (Dr. Dauphin noting that "[b]y oral history it is clear that Mr. Houston was classified for special education services, most likely in association with some level of mental retardation"); Tr. 703 (statement by Dr. Nair noting that Plaintiff functioned in the "low average range of intelligence" and that Plaintiff's attention span and concentration appeared "somewhat impaired"); Tr. 778 (statement by Dr. Masood noting that Plaintiff "appears immature from his responses; his way of communicating and conducting himself give the impression of somewhat cognitive impairment – could be mild to borderline."); Tr. 759 (record from St. John's Health noting that Plaintiff "may have some kind of mental retardation.").)  And, regarding the lay evidence, Plaintiff's mother described Plaintiff as lacking "logic" and thinking "like a elementary school kid – not like an adult."  (Tr. 109.)  Plaintiff's father stated that Plaintiff has always had a "very short attention span."  (Tr. 135.)  Roger Martin, one of Plaintiff's teachers, indicated on his Teacher Questionnaire that Plaintiff had very serious problems acquiring and using information when in school, including reading comprehension, understanding class discussions, and applying problem-solving skills in class discussions.  (Tr. 716.)  On the other hand, the Court recognizes that both Drs. Van Horn and Bord found that Plaintiff may have underperformed on his intelligence testing and therefore concluded that Plaintiff had only borderline intellectual functioning.  (Tr. 646, 833.)  Further, Plaintiff only scored in the borderline range when he was 14 years old.  (Tr. 684.)  But it is for the ALJ to resolve such conflicts in the evidence in the first instance.  *See Bass*, 499 F.3d at 509.

The Court notes that Plaintiff's antisocial personality disorder could also have existed prior to age 22.  Plaintiff has been repeatedly diagnosed, including by doctors and licensed psychologists,

with personality disorders.  (Tr. 627 (inpatient physician diagnosed Plaintiff with antisocial personality in 1993); Tr. 233 (MDOC evaluator diagnosed Plaintiff with impulse-control disorder, NOS, personality disorder, NOS in 2000); Tr. 532 (MDOC evaluator diagnosed Plaintiff with personality disorder, NOS in 2006 ); Tr. 647-48, 750 (Dr. Van Horn noted personality testing scores were reflective of either exaggeration or a "cry for help" and that they revealed that Plaintiff was "impulsive and unable to delay gratification" and diagnosed Plaintiff with antisocial personality disorder).)  Further the *Diagnostic and Statistical Manual of Mental Disorders* describes antisocial personality disorder as follows:

> The essential feature of Antisocial Personality Disorder is a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood . . . .
>
> Individuals with Antisocial Personality Disorder fail to conform to social norms with respect to lawful behavior . . . .  They may repeatedly perform acts that are grounds for arrest . . . such as . . . pursuing illegal occupations.  Persons with this disorder disregard the wishes, rights, or feelings of others.  They are frequently deceitful and manipulative to gain personal profit or pleasure . . . .  They may repeatedly . . . malinger.  A pattern of impulsivity may be manifested by a failure to plan ahead . . . .  Decisions are made on the spur of the moment . . . this may lead to sudden changes of jobs, residence or relationships. . . .  Irresponsible work behavior may be indicated by significant periods of unemployment despite available job opportunities, or by abandonment of several jobs without a realistic plan for getting another job.

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision 702 (4th ed. 2000).  As set forth above, the lay evidence ignored by the ALJ appears consistent with this description and Plaintiff's diagnoses as an adult.

In short, while the Court acknowledges that there is a significant time gap between Plaintiff's post-incarceration diagnoses and his 22nd birthday, and the non-medical evidence supporting

27

disability prior to age 22 is not overwhelming, it was not correct for the ALJ to dismiss that evidence as completely irrelevant to Plaintiff's disability prior to age 22. Accordingly, remand is warranted.[11]

### G.  Conclusion

For the foregoing reasons, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED. On remand, the ALJ is to comply with the procedures set forth in S.S.R. 83-20 and review the relevant medical and non-medical evidence of record to determine whether the onset date of Plaintiff's disability was prior to Plaintiff's 22nd birthday.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal

---

[11]The Court notes that the ALJ did not consider whether the medical evidence that was provided sheds light on whether Plaintiff was disabled prior to age 22 and a medical advisor might be helpful on this issue. Should the ALJ conclude, in view of both the lay and medical evidence, that the record is ambiguous as to the onset date of Plaintiff's mental impairments, S.S.R. 83-20 provides that a medical advisor should evaluate all the evidence at issue. *Plumley*, 2010 WL 520271, at *8 ("While SSR 83-20 does not mandate that a medical advisor be called in every case, courts have construed this step to be 'essential' when the record is ambiguous regarding onset date." (citing and quoting cases)).

28

quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case

Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies,

through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon

this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an

objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).




                                        s/Laurie J. Michelson_____
                                        LAURIE J. MICHELSON
                                        UNITED STATES MAGISTRATE JUDGE

Dated:  September 30, 2011


                        CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on September 30, 2011.


                                        s/Jane Johnson_____
                                        Deputy Clerk